AUSA:   Shankar Ramamurthy   Telephone:   (202) 924-5368

AO 106 (Rev. 04/10)  Application for a Search Warrant   Special Agent:   Michael Pemberton   Telephone:   (313) 670-9117

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>18200 Wyoming Street<br>Detroit, Michigan 48221 | )<br>)<br>)<br>)<br>)<br>) | Case: 2:21−mc−50905<br>Assigned To : Drain, Gershwin A.<br>Assign. Date : 6/23/2021<br>Description: SEALED MATTER (MAW) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Pemberton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: _____ June 23, 2021 _____

City and state: _____ Detroit, MI _____

*Judge's signature*

Hon. Elizabeth A. Stafford, U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>18200 Wyoming Street<br>Detroit, Michigan 48221 | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Pemberton, Special Agent for the Department of Health and Human Services, Office of the Inspector General, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.     I am a Special Agent with the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), assigned to the Detroit, Michigan, Field Office. I joined the United States Air Force in 1995 and served nearly 13 years on active duty. In 2000, while on active duty, I graduated from the Air Force Office of Special Investigations ("AFOSI") Academy at Andrews Air Force Base, Maryland. I was an AFOSI Special Agent for the last

seven years of my Air Force career. From August 2008 to June 2015, I was a Special Agent with the United States Environmental Protection Agency ("EPA"). Upon becoming an EPA Special Agent, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center at Glynco, Georgia.

2.      I have been a Special Agent with HHS-OIG since June 2015. As a Special Agent with HHS-OIG, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1347 (Health Care Fraud),  Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18 United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and/or Wire Fraud). In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses, including at medical facilities, such as pharmacies, and individuals' residences.

## **PURPOSE OF THE AFFIDAVIT**

3.      This affidavit is written in support of an application to search the premises of:

     a.  Wyoming Discount Pharmacy LLC ("Wyoming"), located at 18200 Wyoming St., Detroit, Michigan 48221 ("Subject Premises").

2

4.      For the reasons stated below, there is probable cause to believe that records are stored at the Subject Premises that are related to a conspiracy to defraud the Medicare and Medicaid programs.

5.      As discussed herein, the statements in this affidavit are based upon information I learned during the investigation, information provided to me by other law enforcement agents, and my experience and background as an HHS-OIG Special Agent. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of crime, fruits of crime, contraband, and other items illegally possessed in violation of the aforementioned federal laws are located at the Subject Premises.

6.      As discussed herein, there is probable cause to believe that certain items and property are located within the Subject Premises, including but not limited to financial records, patient files, and other evidence and fruits and instrumentalities of violations of:

A.      Title 18, United States Code, Section 1347, Health Care Fraud;

B.      Title 18, United States Code, Section 1343, Wire Fraud; and,

C.      Title 18, United States Code, Section 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud.

3

## <u>VIOLATION STATUTES</u>

7.     Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1)  to defraud any health care benefit program; or

(2)  to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

8.     Title 18, United States Code, Section 1343, prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

9.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. §§ 1347 and 1343.

10.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## THE MEDICARE AND MEDICAID PROGRAMS

11.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

12.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

13.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and

5

supplies, and other health services and supplies not paid by Part A. This investigation involves Medicare Part D, prescription drug benefits.

14.     A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan. The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM for its payments to the pharmacy. PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

15.     CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. CVS Caremark processes and adjudicates claims electronically in Arizona. OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

16.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments are called capitation fees. The capitation fee is adjusted

periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

17.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

18.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

19.     Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity Medicare Drug Integrity Contract ("MEDIC"). Qlarant's role is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage organizations) and Part D (prescription drug coverage) programs on a national level.

20.     The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain other individuals who lack adequate resources to pay for medical care. CMS is responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries." Medicaid claims are submitted to PBMs that process these claims electronically outside the state of Michigan.

21.     Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## SUBJECT PREMISES

### Wyoming

22.     Wyoming is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). Youssef "Joe" Berri ("Berri") organized Wyoming on May 27, 2014. According to the Articles of Organization, Berri was also the resident agent. Wyoming's 2020 annual report listed Berri as the

resident agent and the address as 18200 Wyoming St., Detroit, Michigan 48221. This is the "Subject Premises."

23.     An application was submitted on behalf of Wyoming to McKesson, it's largest wholesaler, on June 25, 2014, listing "Joe Berri" as the "Accounts Payable Contact Person," the "Ship to Contact Person," and the person to contact concerning any questions with the application. Berri signed the application as owner. Also, on June 25, 2014, Berri signed an Asset Purchase Agreement with McKesson on behalf of Wyoming as the "Sole Member."

24.     According to September 2014 and November 2016 provider certifications that were provided to Express Scripts, a PBM, on behalf of Wyoming, the practice address for Wyoming is Subject Premises since at least approximately September 2014. The provider certifications list Berri as the 100% owner and managing employee/agent.  Both certifications, signed by Berri, state that Wyoming maintains electronic patient profiles (patient demographic information stored electronically).

25.     In April 2018, Berri signed a Participating Pharmacy Medicare Part D Certification for 2018, specifically attesting to his knowledge and compliance with Medicare fraud, waste, and abuse laws and regulations. Berri signed the certification as the responsible party on behalf of Wyoming, located at the Subject Premises.

26.     On June 2, 2021, I went to Wyoming and verified it is currently

9

operational and located at Subject Premises.

## PROBABLE CAUSE FOR SUBJECT PREMISES

### Fraud Scheme at Wyoming

27.    Berri, and others employed by Wyoming, are believed to have submitted or caused to be submitted false and fraudulent claims on behalf of Wyoming through interstate wires to Medicare, Medicaid, and other insurers, through a common pharmacy fraud scheme, known as a shortage scheme. In a shortage scheme, the pharmacy bills Medicare, Medicaid, and other health insurers for medication that the pharmacy does not actually dispense to patients. Put another way, at a high-level, the pharmacy is submitting a higher volume of medication in claims to Medicare, Medicaid, and other insurers, than it purchased during the relevant period. The claims submitted by Wyoming were processed and adjudicated electronically on behalf of Medicare by CVS Caremark, OptumRx, and Express Scripts, among other PBMs.

28.    In 2017, the Michigan Department of Health and Human Services—Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Wyoming for the period October 5, 2014, through February 28, 2017. MDHHS-OIG's invoice review compared Wyoming's drug purchases to its Medicaid billing for this period. MDHHS-OIG determined that Wyoming had a shortage of a number of medications that resulted in a loss to Medicaid of $155,237.71. MDHHS-OIG

10

typically only considers overpayments for Medicaid and not to Medicare.

29.    As part of the audit, Wyoming's pharmacy manager, Hussein Darwiche, filled out and signed a questionnaire setting forth the electronic billing system used by Wyoming, the wholesaler from whom Wyoming purchased drugs, and a list of Wyoming employees.

30.    As a result of the audit, MDHHS-OIG entered into a Repayment Agreement with Youssef Berri, both in his individual capacity and as the managing employee of Wyoming, on October 23, 2017. Pursuant to the Repayment Agreement, Berri was required to repay the full $155,237.71, within 24 months of entry of the agreement.

31.    Also, as part of the MDHHS-OIG audit in 2017, surveys were sent out by mail to Medicaid beneficiaries.  These surveys asked the beneficiaries whether they received certain drugs from Wyoming on specific dates.  The survey requested the specific drug name, quantity, strength, and a photograph of the medication for reference.  A description of what the specific medication treats was also provided in the survey.

32.    MDHHS-OIG received five returned beneficiary surveys, which were provided to me upon request. The drugs asked about in the surveys were Latuda 40MG tablet, Saphris 5 MG tablet, Seroquel XR 300 MG, and Aripiprazole 5 MG tablet.  All four of these drugs were in the top 15 identified shortage drugs identified

by the Qlarant audit. Out of the five survey responses, four beneficiaries claimed to have not received the drug in question from Wyoming. One of the five beneficiaries claimed to have gotten the medication, but essentially wrote a response saying they threw the medication (Seroquel XR) away because they were not bipolar or schizophrenic.

33.    An invoice review conducted by HHS contractors, also found a shortage with medications billed to Medicare. Between October 1, 2014, through May 1, 2019, claims were submitted on behalf of Wyoming to Medicare for the reimbursement of prescription drugs that Wyoming neither ordered nor dispensed to beneficiaries. The evidence described in detail below establishes probable cause that Berri submitted or caused the submission of claims through interstates wires to Medicare and Medicaid and was reimbursed at least $857,695.28 for prescription drugs that Wyoming did not order or dispense during this period.

**Qlarant Invoice Reconciliation**

34.    As part of this investigation I requested that Qlarant perform an invoice reconciliation of Wyoming's pharmaceutical purchases. An invoice reconciliation compares the drug purchase records to the Medicare and Medicaid billing data to determine whether a pharmacy has purchased sufficient drugs to justify their billings.

35.    In this investigation, I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Wyoming, which are listed

below. I furnished all of the wholesaler records and Medicare and Medicaid data that I received to Qlarant and requested an invoice review for the period of October 1, 2014, through May 1, 2019. Qlarant compared invoices for Wyoming's drug purchases to Medicare and Medicaid claims data for this period.

36.   On March 9, 2021,[1] Qlarant provided the following summary of its invoice review:

**Wholesalers with Supportive Invoices:**

**Date Range of Invoice Review:** 10/1/2014 – 5/1/2019

**Number of Drugs Reviewed:** 2,244

**Number of Drugs with Shortages:** 1,177

**Approximate Loss to Medicare:** $707,428.70

**Approximate Loss to Medicaid:** $150,266.58

**Approximate Combined Loss to Medicare and Medicaid:** $857,695.28

37.   Based on the Qlarant analysis, I created the following summary for Wyoming's top-ten drug shortages by approximate overall dollar loss to federal health care programs.

---

[1] Qlarant provided an initial invoice review summary for Wyoming on January 30, 2020. That summary included an analysis of the top 60% of medications that Wyoming had billed to Medicare and Medicaid. Qlarant's updated invoice review from January 2021, shown above, includes an analysis of 100% of the medications that Wyoming billed to Medicare and Medicaid.

| PDE Description | Shortage Total |
|---|---|
| Latuda Tab 40MG | $29,515.50 |
| Renvela Tab 800MG | $23,316.70 |
| Saphris Sub 5MG | $22,290.60 |
| Spiriva Cap Handihlr | $20,624.10 |
| Advair Disku Aer 250/50 | $20,178.00 |
| Lidocain OIN 5% | $18,204.29 |
| Aripirazole Tab 5MG | $17,400.30 |
| Novolog Inj Flexpen | $16,823.58 |
| Ventolin HFA AER | $16,366.61 |
| Lantus Inj 100/ML | $14,766.80 |

38.    In sum, Qlarant concluded that Wyoming's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 658 of the 2,224 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Wyoming approximately $857,695.28 for medications that Wyoming did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Latuda 40 MG tablets, Renvela 800 MG tablets, and Saphris Sub 5 MG.

### Billing for Deceased Beneficiaries at Wyoming

39.    I conducted a review of the Medicare Part D claims data and Medicaid claims data for Wyoming, which revealed that Wyoming billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately October 2015 and August 2019, Wyoming submitted claims for nine dates of service on behalf of 4 Medicare beneficiaries for medications purportedly

14

dispensed to beneficiaries after their dates of death. Wyoming was reimbursed approximately $1634.02 for 27 drugs that were billed to Medicare after the beneficiary date of death. Of these 27 drugs, 13 were billed after the beneficiary date of death in 2019.

40.    Between approximately July 2015 and March 2016, Wyoming submitted claims for nine dates of service on behalf of four Medicaid beneficiaries for medications purportedly dispensed to beneficiaries after their dates of death. 22 drugs were billed to Medicaid after the beneficiary date of death, for which Wyoming was reimbursed approximately $3,116.17.

### Wyoming Beneficiary Interviews

### C.B. (Medicare Beneficiary)

41.    I interviewed C.B., a Medicare beneficiary who used Wyoming as his/her pharmacy from approximately January 2018 to May 2019. I reviewed with C.B. Wyoming's Medicare claims as they pertained to C.B., specifically with regard to fifteen Tudorza inhalers that were billed from January 2018 to May 2019. He received his/her prescriptions at the Subject Premises.

42.    C.B. stated s/he used Ventolin, Proair, and Advair inhalers. C.J. stated s/he received a Tudorza inhaler only one or two times from Wyoming, and stopped receiving them from Wyoming because s/he did not like the taste in his/her mouth after using it.

15

43.     C.B. stated s/he did not receive a Tudorza inhaler fifteen times as billed to Medicare on behalf of Wyoming.

## P.S. (Medicaid Beneficiary)

44.     I interviewed P.S., a Medicaid beneficiary who used Wyoming two to three times beginning in approximately September 2015.  P.S. had previously filled out an MDHHS-OIG survey as part of the 2017 audit (*see* ¶ 28-29, *supra*). I reviewed with P.S. Wyoming's Medicaid claims as they pertained to P.S.  P.S. stated s/he never received several of the medications billed by Wyoming from September 2015 – July 2017, including Aripiprazole, Strattera, Oxymorphone, Lidocaine, or the inhalers (Ventolin and Dulera).

45.     In particular, Medicaid was billed on at least 19 occasions for Aripiprazole, Strattera, Oxymorphone, Lidocaine and the inhalers, between July 21, 2016 and July 24, 2017.

## L.G. (Medicaid Beneficiary)

46.     I interviewed L.G., a Medicaid beneficiary who did not specifically recall using Wyoming but said s/he might have used the pharmacy in 2016.  L.G. had previously filled out an MDHHS-OIG survey as part of the 2017 audit (*see* ¶ 28-29, *supra*).  I reviewed with L.G. Wyoming's Medicaid claims as they pertained to L.G.  L.G. stated s/he never received the Saphris, Metformin, or Combivent, from Wyoming, even though these drugs were billed to Medicaid by Wyoming.

16

47.    Between August 5, 2016, and November 3, 2016, Medicaid was billed for Saphris, Metformin, of Combivent dispensed to L.G., on at least 12 occasions.

48.    L.G. also did not recognize the name of the prescribing physician who purportedly prescribed the medication billed to Medicaid by Wyoming.

### Medicare Reimbursements

49.    Records obtained from PBMs Express Scripts and Optum included copies of negotiated checks issued by the PBMs to Wyoming constituting Medicare reimbursements. The checks date back to at least October 2014 and show that Medicare reimbursements were deposited into at least the following bank account:

    a.    Citizens Bank Account No. X6438;

    b.    Citizens Bank Account No. X6913.

50.    Records obtained via grand jury subpoena from Citizens Bank (formerly Charter One Bank) show that Berri opened Bank Account Nos. X6438 and X6913, is a signatory on the accounts, and listed himself as the "individual owner" of Wyoming.

51.    The account statements for both Citizens Bank Accounts were mailed to the address for the Subject Premises.

52.    Grand jury records from Citizens Bank Account Nos. X6438 and X6913 also show that the accounts were used to purchase drugs from wholesalers,

17

including McKesson. Between October 2014 and February 2019 over $6.5 million from the two accounts was used to purchase drugs from McKesson.

## Evidence of Wyoming Records Located at Subject Premises

53.    In November 2016 Berri certified to Express Scripts that he maintained electronic patient profiles.

54.    A June 2015 OptumRx Compliance Audit at the Subject Premises identified prescription records, prescription labels, prescriptions, delivery signature logs, a safe, and medication stocked on shelves at Subject Premises.

55.    In an April 2018 Participating Pharmacy Medicare Part D Certification Berri attested to his knowledge and compliance with Medicare fraud, waste, and abuse laws and regulations on behalf of Wyoming, located at the Subject Premises.

56.    On May 23, 2019, a Pharmacy Renewal application was filed on behalf of Wyoming with LARA, listing the Subject Premises as the address for the pharmacy.

57.    On February 4, 2020, a corporate annual statement was filed on behalf of Wyoming with LARA, listing the Subject Premises as the address for the pharmacy.

58.    Based on the above documentation, events, and interviews, there is probable cause that Wyoming's records are located at the Subject Premises.

### Request to Seize Computers and Computer Records

59.     It has been your Affiant's experience and training that, generally,

business offices rely upon computers to create and store data, including Medicare

and Medicaid billing data, and that Medicare and Medicaid claims are submitted

electronically via computers. It is likely that the providers' insurance billing and

patient records, documents, and materials will be found stored on computers in

their respective offices.

60.     Upon securing the premises, law enforcement personnel trained in

searching and seizing computer data (computer personnel) will access any

computer equipment and storage devices to determine whether these items can be

searched on-site in a reasonable amount of time and without jeopardizing the

ability to preserve data. If computer personnel determine that these items cannot be

searched on-site in a reasonable amount of time and without jeopardizing the

ability to preserve data, the agents will seize the computer equipment and storage

devices for the purposes of conducting an off-site search, consistent with Federal

Rule of Criminal Procedure 41(e)(2)(B).

61.     If the computer personnel determine that the data reviewed does not

fall within any of the items to be seized pursuant to this warrant or is not otherwise

legally seized, the government will return these items within a reasonable period of

time from the date of seizure unless further authorization is obtained from the
court.

62.     Authority is sought to search any computer related equipment capable
of creating and/or storing information in electronic or magnetic form for the items
listed in Attachment B. "Computer related equipment" refers to:

- Computer hardware, consisting of all equipment that can collect,
  analyze, create, display, convert, store, conceal, or transmit electronic,
  magnetic, optical, or similar computer impulses or data. Hardware
  includes, but is not limited to, any data-processing devices (such as
  central processing units, memory typewriters, self-contained "laptop" or
  "notebook" computers, "palm pilots" or personal data assistants, "tablet"
  computing devices, smartphones, iPods or other similar media devices,
  memory facsimile machines, and "schedulers"); internal and peripheral
  storage devices (such as fixed disks, external hard drives, floppy disk
  drives and diskettes, USB storage devices, optical storage devices,
  transistor-like binary devices, read/write CD and DVD devices, and any
  and all storage devices); peripheral input/output devices (such as
  keyboards, printers, scanners, video display monitors, mouse devices);
  and related communications devices (such as modems, cables and
  connections, recording equipment, RAM or ROM units); as well as
  any devices, mechanisms, or parts that can be used to restrict access to
  computer hardware (such as physical keys and locks);

- Computer software, that is, digital information that can be interpreted
  by a computer and any of its related components to direct the way
  they work. Software is stored in electronic, magnetic, optical, or other
  digital form. It commonly includes programs to run operating systems,
  applications (like word processing, networking, graphics, accounting,
  presentations or spreadsheet programs), utilities, compilers, interpreters,
  and communications programs;

- Computer passwords and other data security devices, that is, a string of
  alphanumeric characters designed to restrict access to or hide computer
  software, documentation, or data. Data security devices may consist of
  hardware, software, or other programmable code. A password usually

operates as a sort of digital key to "unlock" particular storage data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

- Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals.

63.     If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.

64.     Based on the foregoing, and consistent with Rule 41(e) (2) (B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

21

## CONCLUSION

65.    Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises will contain the items set forth in Attachment B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud).

## REQUEST FOR SEALING

66.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the fraud scheme described herein. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Michael Pemberton, Special Agent
U.S. Department of Health and Human
Services – Office of Inspector General

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_Elizabeth A. Stafford_
Hon. Elizabeth A. Stafford
United States Magistrate Judge

Dated:   June 23, 2021

## ATTACHMENT A – PREMISES TO BE SEARCHED

Premises to be searched are:

### <u>Subject Premises</u>

Subject Premises, depicted below, is located at 18200 Wyoming St., Detroit, MI 48221, and all buildings, structures, and appurtenances thereof. This address is located in a mixed commercial/residential area surrounded by other buildings and lots. The building is composed of red brick and stucco-type building material. A sign on the front of the pharmacy reads, "Wyoming Discount" and "HealthMart Pharmacy." The numbers "18200" appear over the door to the main entrance to the pharmacy. This premises is located near the intersection of Wyoming St. and Curtis St. on the east side of Wyoming St.



## ATTACHMENT B

## I.   ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud) specifically including from October 2014 to May 2019:

1.  All records related in any way to patients of Wyoming Discount Pharmacy LLC, including, without limitation, the following type of records: patient charts, files, records, insurance cards, licenses, identification cards, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, appointment books, telephone logs, physician notes, nursing notes, medical assistant notes, original patient or referral source listings.

2.  All documents constituting, concerning, or relating to bills, invoices and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3.  All financial and tax-related books, records and documents related in any way to the above Youssef "Joe" Berri and/or Wyoming Discount Pharmacy, LLC, including, without limitation:

a) Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

b) Credit/Automatic Teller Machine/Debit card accounts;

c) All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

d) All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

e) All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

f) All financial statements, accounts payable/receivable, and credit reports.

4.    All records and other items relating to the ordering, maintenance, or dispensing of all medications, including controlled substances in Schedules II, III, IV, and/or V.

5.    Documentation of all patient appointments or scheduling and patient sign-in sheets.

6.    All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

7.    All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

8.    All invoices and supporting documentation evidencing monies owed to or received from Youssef "Joe" Berri and/or Wyoming Discount Pharmacy, LLC.

9.    All contracts, billing agreements, professional services agreements, or any other contracts between Youssef "Joe" Berri and/or Wyoming Discount Pharmacy, LLC, and any other individual, company, physician or billing company.

10.   All Medicare handbooks, manuals, instruction materials, newsletters or other Medicare publications.

11.   Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

12.   Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

13.   Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws and annual reports.

14.   All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

15.   Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

16.   All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, computers, laptops, hard drives, servers, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives. Any electronic storage media, including, without limitation, cellular telephones, pagers,

29

electronic organizers, and PDAs, may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant. Where data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

17. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment which contains any of the aforesaid information.

18. Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

a. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b. If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c. If the computer personnel determine it is not practical to perform on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d. Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f.  If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time.

g.  In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

  i.  Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

  ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

  iii.  Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash

drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

iv.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.   Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>18200 Wyoming Street<br>Detroit, Michigan 48221 | )<br>)<br>)<br>)<br>)<br>) |

Case: 2:21−mc−50905
Assigned To : Drain, Gershwin A.
Assign. Date : 6/23/2021
Description: SEALED MATTER (MAW)

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Michigan_____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before     July 7, 2021_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   the presiding United States Magistrate Judge on duty   .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     June 23, 2021     3:14 pm

*Elizabeth A. Stafford*
*Judge's signature*

City and state:     Detroit, MI

Hon. Elizabeth A. Stafford, U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*